# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**Oct 28, 2022**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| INFORMATION ASSOCIATED WITH | ) | Case No. |
| TLECLAIR101@GMAIL.COM THAT IS | ) | 2:22-sw-0782 CKD |
| STORED AT PREMISES CONTROLLED | ) | |
| BY GOOGLE, LLC | ) | |
| | ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

## SEE ATTACHMENT A, attached hereto and incorporated by reference.

located in the | Northern | District of | California |, there is now concealed *(identify the person or describe the property to be seized)*:

## SEE ATTACHMENT B, attached hereto and incorporated by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 2251 | Sexual Exploitation of Minor(s) |
| 18 U.S.C. §§ 2423(c) | Engaging in Illicit Sexual Conduct in a Foreign Place |

The application is based on these facts:

## SEE AFFIDAVIT, attached hereto and incorporated by reference.

- ☑ Continued on the attached sheet.
- ☐ Delayed [    ] days (give exact ending date if more than [    ] ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/

*Applicant's signature*

Special Agent Scott A. H. Schofield, FBI

*Printed name and title*

Sworn to before me telephonically and signed pursuant to Rule 4.1.

Date: 10/28/22 at 22 at 11:30 am

*Judge's signature*

City and state: Sacramento, California

Carolyn K. Delaney, U.S. Magistrate Judge

*Printed name and title*

1   PHILLIP A. TALBERT
    United States Attorney
2   CHRISTINA McCALL
    Assistant United States Attorney
3   501 I Street, Suite 10-100
    Sacramento, CA 95814
4   Telephone: (916) 554-2700
    Facsimile:  (916) 554-2900
5

6   Attorneys for Plaintiff
    United States of America
7

8              IN THE UNITED STATES DISTRICT COURT

9              EASTERN DISTRICT OF CALIFORNIA

10

11   In the Matter of the Search of:          CASE NO.

12   INFORMATION ASSOCIATED WITH          AFFIDAVIT IN SUPPORT OF AN APPLICATION
     GOOGLE ACCOUNT(S):                   FOR A SEARCH WARRANT
13   TLECLAIR101@GMAIL.COM THAT ARE
     STORED AT PREMISES CONTROLLED BY
14   GOOGLE, LLC

15

16          I, Scott A. H. Schofield, being first duly sworn, hereby depose and state as follows:

17                  **I.      INTRODUCTION AND AGENT BACKGROUND**

18          1.      I make this affidavit in support of an application for a search warrant for information

19   associated with certain accounts that are stored at premises controlled by GOOGLE, LLC, a social

20   network company headquartered at 1600 Amphitheatre Parkway, Mountain View, California, 94043.

21   The information to be searched is described in the following paragraphs and in Attachment A, hereby

22   incorporated by reference.  This affidavit is made in support of an application for a search warrant under

23   18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require GOOGLE, LLC to disclose to the

24   government copies of the information (including the content of communications) further described in

25   Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B

26   (hereby incorporated by reference), government-authorized persons will review that information to

27   locate the items described in Section II of Attachment B.

28          2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since 2004.

I am currently assigned to the Violent Crimes Against Children Squad in the Sacramento Division. While employed by the FBI, I have investigated federal criminal violations related to high technology or cybercrime, child exploitation, and child pornography.  I have received training in the area of identifying and investigating child pornography and child exploitation crimes, and as part of my duties have observed and reviewed countless examples of child pornography in all forms of media, including computer media.  I have served temporary duty assignments in both the Philippines and Cambodia during which I assisted in numerous investigations of American citizens who traveled to these countries for the purpose of having sex with minors.  In the course of my employment, I have participated in many search warrants in connection with child exploitation matters and other violations involving both physical locations like businesses and residences, as well as online accounts.  Moreover, I am a federal law enforcement officer who is engaged in enforcing the criminal laws, including 18 U.S.C. §§ 2251, 2252, 2423(b), (c), (f) and 2422(b), and I am authorized by the Attorney General to request a search warrant.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from others.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and, therefore, does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18 U.S.C. § 2251(a), (c), and (e), relating to the production of material involving the sexual exploitation of minor(s) in the United States and in foreign places, and Title 18 U.S.C. §2423(c), relating to engaging in illicit sexual conduct with a minor in foreign places, have been committed by the user(s) of the GOOGLE account listed in Attachment A (hereinafter referred to as the "SUBJECT ACCOUNT").  I submit that there is probable cause to search the SUBJECT ACCOUNT for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## II.     **JURISDICTION**

5.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) &

1   (c)(1)(A).  Specifically, the Court is "a[] district court of the United States . . . that – [] has jurisdiction

2   over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3                   **III.        BACKGROUND CONCERNING GOOGLE**

4            6.       The information contained in this section contains my understanding of some of Google's

5   products and services.  I know, based on my training and experience, that GOOGLE is an online Internet

6   search engine that also offers a variety of products for personal and commercial needs such as: a free

7   search engine called Google Search; a free video streaming site called YouTube; free email accounts

8   (which GOOGLE calls Gmail); a now-defunct social media service (GOOGLE Plus); cloud/network

9   storage services (GOOGLE Drive); internet browsers (GOOGLE Chrome); internet chats (GOOGLE

10  Hangouts); location and mapping services (GOOGLE Maps and Waze), and various other media

11  applications.  Gmail is commonly used to email images and attachments, and the GOOGLE Drive and

12  Photos cloud storage applications are also commonly used to store images, videos, and documents.

13  GOOGLE Plus was GOOGLE's social network and was similar in idea to Facebook or Twitter, though

14  GOOGLE discontinued this service some time ago.  While it was operating, it consisted of social media

15  update streams, contacts, circles of friends, conversations, and shared content such as videos or images.

16  While the service was discontinued, there may remain some information related to GOOGLE Plus usage

17  on GOOGLE servers.  GOOGLE Hangouts (at one point also known as Google Duo) is a chatting

18  program that allows users to log into their Google account and communicate with other GOOGLE users

19  in either text chat form, or audio or video chat.  I know that in order to access and use the majority of the

20  GOOGLE services described above, the creation of a GOOGLE account is required.  Upon the creation

21  of an account, the user/creator would then have access to all of these extra services and can use them at

22  will.  Google also sells devices, including laptops, mobile phones, tablets, smart speakers, wearable

23  fitness trackers, security cameras, and wireless routers.

24            7.       Google offers an operating system ("OS") for mobile devices, including cellular phones,

25  known as Android. I also know from experience that a person's GOOGLE account can house backup

26  copies of a person's Android or GOOGLE devices, such as cellular telephones and tablets.  If a person's

27  entire device is not set to backup to their GOOGLE account, portions of the data on the devices, such as

28  photos or video files, may be set to back up to the online GOOGLE account.

8.      In my training and experience, GOOGLE generally asks subscribers to provide certain personal identifying information when registering for an account.  Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, email addresses, and other personal information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and experience, I know that even if subscribers insert false information to conceal their identity, this information can provide clues to their identity, location or illicit activities.

9.      In my training and experience, social network and email providers typically retain certain transactional information about the creation and use of each account on their systems.  This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of services utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account.  In addition, social network and email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account.  Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the account.

10.      As explained herein, information stored in connection with a social media or email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, the information stored in connection with a GOOGLE account can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, email communications, "friend" lists, chat communications, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time.  Further, information maintained by the provider can show how and when the account was accessed or used.  For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the

account along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation.  This geographic and timeline information may tend to either inculpate or exculpate the account owner.  Additionally, information stored in the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email).  Lastly, stored electronic data may provide relevant insight into the account owner's state of mind as it relates to the offense under investigation.  For example, information in the account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## IV.    PROBABLE CAUSE

In June 2022, a man with initials MQ contacted the FBI National Threat Operations Center to report that a man named TERRY LE CLAIR (hereinafter "LE CLAIR") had inappropriately touched MQ while on a trip to Europe in 2017 and took pictures of this touching, as well as of MQ's genitalia. MQ was 15 years of age at the time of the trip.

### INTERVIEW OF MQ

11.    I interviewed MQ in late June 2022 and he told me the following, in part:

a)    When MQ was approximately 12 years of age, his sister became interested in dog agility training.  Their mother took them to the residence of LE CLAIR in Shingle Springs, California, within the Eastern District of California.  LE CLAIR was retired from the tech industry and was a well- known dog agility trainer.  LE CLAIR's property had a dog agility course on the northern end of the property.

b)    When they arrived, LE CLAIR offered to allow MQ to run one of LE CLAIR's dogs through the course as well.  MQ did so and LE CLAIR told him he had real talent.  LE CLAIR offered to begin to train MQ in dog agility.  MQ took to it quickly and enjoyed the training.  While his sister ceased training with LE CLAIR in a few months, MQ continued training.

c)      Eventually, MQ began to compete at dog agility meets with LE CLAIR.  For some of these meets, he would stay the night prior to the event at LE CLAIR's home and then travel to the meets with LE CLAIR the following morning.

d)      After three years, LE CLAIR told MQ about an international dog agility competition taking place in July 2017 in Luxembourg.  LE CLAIR believed MQ was skilled enough to compete in this international meet.  MQ's parents were unable to pay for the trip, but LE CLAIR offered to pay the lion's share of the costs of the trip, and to pay for MQ's older brother, referred to herein as "CQ," to accompany them.  CQ was 17 years of age at the time, but turned 18 during the trip to Europe.

e)      LE CLAIR, MQ, and CQ left for Europe in early July 2017.  MQ provided photos of his passport reflecting an entry stamp at Paris' Charles De Gaulle airport on July 6, 2017.  The trip lasted approximately two weeks and the trio toured through various European countries until they arrived in Luxembourg.

f)      MQ competed in the meet in Luxembourg and then the trio toured back to Paris.  They stayed in a hotel off the Champs Elysees with a view of the Arc de Triomphe.  They were scheduled to leave on July 21, 2017.

g)      On July 19, 2017, MQ and CQ decided they wanted to get drunk.  In Europe, the legal drinking age is younger and they reasoned this may be their only chance before returning to the United States.  LE CLAIR overheard their conversation and told them he would accompany them and pay for the drinks, but remain sober himself and ensure they returned to the hotel safely.

h)      That night, they went drinking.  MQ believed they went to an Irish pub, but was unsure.  MQ recalled that LE CLAIR bought him and CQ drinks with a lot of alcohol in them.  He believed his drink contained over 10 shots of alcohol and his recollection is that he finished his own drink, and finished the portion of CQ's that CQ could not finish.  MQ almost immediately felt drunk.

i)      MQ did not recall much of the rest of that night clearly.  He vaguely recalled walking back to the hotel with CQ and LE CLAIR.  He did clearly recall that he was sick when

they returned to the hotel and he vomited on himself and the hotel room.  He believed LE CLAIR called hotel staff to come clean up the room.

j)      MQ decided to take a shower to clean himself up.  He went into the bathroom, took off his clothes, and the last thing he recalled was lying in the bathtub with the shower running on him.  He believes he passed out lying in the shower.

k)      The next morning, MQ awoke to find himself nude lying in bed.  He did not sleep in the nude, normally, and especially not when he was sharing a hotel room with other people.  However, his last recollection from the night before was lying naked in the bathtub, so he was not completely surprised to find he was not wearing clothes.  He put on his underwear and walked into the bathroom.  LE CLAIR was awake, sitting on his bed with his tablet.[1]

l)      Later that morning, MQ, CQ, and LE CLAIR went to breakfast.  MQ recalled LE CLAIR being inappropriate during this meal.  He specifically recalled LE CLAIR discussing masturbation and asking the boys if they ever inserted their finger into their rectum while masturbating.  This made MQ very uncomfortable.  LE CLAIR had joked about sexual topics before this, but not as explicitly as this.

m)      When they returned to the hotel after breakfast, CQ and LE CLAIR decided to go sightseeing on their last day.  MQ, however, wished to stay behind in the room.  After LE CLAIR and CQ left, MQ decided to talk with friends via Snapchat, a social media app that allows users to communicate by text or video call from anywhere in the world.  However, MQ had vomited on his cell phone, rendering it inoperable, so he used LE CLAIR's tablet instead.

n)      MQ had used LE CLAIR's tablet prior, with LE CLAIR's permission, to watch movies.  He downloaded the Snapchat app to the tablet and logged in to his account.  He began a conversation with a friend with the initials H.M.  Part way through this conversation, MQ accidentally pressed the icon in the Snapchat application that is designed to allow the user to send a photo or video from the device's photo application to another Snapchat user.  When he

---

[1] MQ referred to the device as an "iPad."  However, as detailed later in this affidavit, LE CLAIR was interviewed and indicated he used an Android tablet at the time of the trip to Europe in 2017.  The term iPad is often used to refer to a tablet style computer, regardless of make or operating system.

did this, a window opened showing photos and videos on the device.  The screen was filled with photos of MQ's nude body and genitalia.

o)    MQ was shocked.  He told H.M. what was happening, but did not recall that portion of the conversation well.  He hung up with H.M. and tried to figure out what to do.  He recalled there being a whole screen full of photos of him, estimating he saw over 20.  Some of these photos depicted a close up of his genitalia.  In some of the photos, LE CLAIR's hand could be seen touching his penis.  He knew it was LE CLAIR's hand because he recognized it, and in some of these photos, he could see his brother in the background of the photo asleep.  In addition, the tablet belonged to LE CLAIR.

p)    MQ also observed a video of himself walking around the hotel room in his underwear.  It appeared it had been captured that morning when he had walked into the bathroom.

q)    MQ was in shock.  He sent a message to CQ on Snapchat telling him what he had found.  CQ was skeptical, but believed MQ after MQ sent a few of the photos to CQ to prove his statement.  CQ told him to stay at the hotel and he would come up with a reason to return to the hotel.

r)    When LE CLAIR and CQ arrived, CQ came up with a reason for CQ and MQ to go downstairs without LE CLAIR, and they called their parents.  Many attempts to reach their mother and father were unsuccessful, but they eventually were able to reach their father, referred to herein as "SQ".

s)    SQ told MQ he needed to just keep it together and act like nothing happened until they could get home from Europe.  SQ said he would normally get the next flight to Paris to help MQ and CQ, but he likely couldn't get to Paris before they were scheduled to depart the next morning.

t)    MQ and CQ did so.  MQ was very uncomfortable around LE CLAIR and he believed LE CLAIR realized it.  LE CLAIR seemed upset and scolded MQ about his attitude and mentioned all that LE CLAIR had done for him.

u)    The next day, the three departed Paris, France to return home.  When they

boarded the airplane, MQ tried to sit by himself.  They had three seats, two near the window, then one across the aisle from these two.  When MQ tried to sit in the one across the aisle, LE CLAIR refused to let him, saying he wanted to sit next to MQ and talk to him on the flight.

v)     MQ said LE CLAIR talked to him on the flight back about how ungrateful MQ was for this trip and pointed out that LE CLAIR could have been doing other things with the time he had spent with MQ.

w)     When they landed at the airport in San Francisco, California, MQ's mother picked them up.  They drove to LE CLAIR's house to drop him off, then drove home.  The trip from San Francisco to LE CLAIR's house was very difficult for MQ.  His mother was being nice to LE CLAIR and MQ knew the whole time what LE CLAIR had done to him.

x)     When they returned home, the Q family discussed what happened.  Approximately a week later, MQ's mother (referred to herein as "LQ") and CQ confronted LE CLAIR about what happened.  MQ was not present for this discussion. *[I interviewed LQ  and CQ and their discussion with LE CLAIR is related later in this affidavit.]*

y)     MQ did not know then how this would affect him, but in the following months he began to have difficulties in school.  He began experimenting with alcohol and drugs and his grades suffered.  He also struggled with self-harm.

z)     MQ had not spoken to LE CLAIR since they returned from Paris, France.

aa)     During the interview, MQ positively identified the California Driver's License picture of TERRY LE CLAIR as the man he was referring to as LE CLAIR throughout this interview.  He was shown the picture, but not the name associated with the picture.

12.     MQ later emailed me a picture of his passport, confirming the dates of entry to and exit from Paris, France as July 6 and 21, 2017, respectively.  MQ also emailed me a series of photos depicting himself, CQ, and LE CLAIR in Europe, including one depicting LE CLAIR and MQ in front of the Eiffel Tower in Paris, France.

***INTERVIEW OF CQ***

13.     I interviewed CQ in early July 2022.  CQ told me the following, in part:

a)      CQ confirmed the details of the trip to Europe described to me by MQ.  CQ confirmed he had received the message from MQ while CQ was sightseeing with LE CLAIR and confirmed that MQ had sent him a few of the pictures MQ had found on LE CLAIR's tablet when CQ was skeptical of MQ's story.

b)      CQ confirmed that the photos he had seen depicted MQ's genitals.  However, he could not describe the photos in more detail because he did not look at them closely.  Once he saw that they depicted his brother's penis, he looked away and began thinking about what to do about the situation.

c)      CQ recalled boarding the plane to return from Paris and trying to sit next to LE CLAIR in the seats near the window to shield MQ from having to sit next to LE CLAIR.  However, LE CLAIR insisted on sitting next to MQ.

d)      CQ recalled talking to LE CLAIR with his mother and confronting him about taking the photos.  CQ's memory of this conversation is that LE CLAIR did not admit to taking the photos.  CQ pointed out to LE CLAIR that CQ had seen some of the photos.  At that point, LE CLAIR's face became "beet red."  CQ said it seemed like LE CLAIR did not know what to say.

## INTERVIEW OF LQ

14.    I interviewed LQ in July 2022 and she told me the following, in part:

a)      LQ confirmed MQ's story of how he and the Q family first became involved with LE CLAIR.  LQ did not recall any "grooming" on the part of LE CLAIR.  LQ advised that the Q family never paid LE CLAIR for any of the training that MQ received.

b)      LQ recalled that when the Luxembourg trip was first suggested, she had refused because the Qs could not afford such a trip at that time.  LE CLAIR had offered to pay most of the costs.  LQ again refused, as she was unable to take time off of her work to accompany MQ and LE CLAIR.  LE CLAIR suggested CQ accompany them.

c)      LQ recalled talking with mothers of other children LE CLAIR was working with about the competition in Europe.  These other mothers had daughters working with LE CLAIR

and their daughters had gone to compete in Luxembourg with LE CLAIR in prior years.  She recalled they encouraged her to allow MQ to go as it would be a great experience.  The accounts of these mothers helped LQ trust that MQ would be safe if she allowed him to travel to Europe with LE CLAIR.

d)      After she had assented to the trip, LE CLAIR had come to the Q family home with a full itinerary, indicating where he and the Q boys would stay, what they would see in each city, and additional details.

e)      LQ recalled hearing about LE CLAIR taking explicit photographs of MQ when her husband called her to tell her he received a phone call from MQ and CQ from Paris.  She was upset when she heard about it.

f)      LQ confirmed she picked up LE CLAIR, MQ, and CQ at the San Francisco airport upon their return from Europe.  She recalled driving to LE CLAIR's house to drop him off, then driving to the Q family home afterward.  She could tell MQ was very upset during the drive from San Francisco.

g)      LQ recalled the confrontation at LE CLAIR's home with CQ about a week after they returned from France.  Her memory was that LE CLAIR acknowledged he took the photos and told her he would delete them.  He was in tears during a portion of this discussion.  She had not seen or had contact with LE CLAIR since that conversation.

15.      LQ later provided the writer with a copies of email communications and attached itinerary documents she had received from LE CLAIR via email, regarding the 2017 trip to the Luxembourg competition.  They were sent from the SUBJECT ACCOUNT and the earliest email was dated March 7, 2016.  The emailed itinerary also listed the hotel the trio stayed at in Paris, France as the Elysees Ceramic Hotel, which is located near the Arc de Triomphe in Paris, France.

## INTERVIEW OF TERRY LE CLAIR

15.      On September 22, 2022, a Federal search warrant was executed at the residence of TERRY LE CLAIR.  LE CLAIR provided a voluntary, Mirandized statement, related below, in part:

a.  LE CLAIR provided the SUBJECT ACCOUNT as his only email address.

b.  LE CLAIR admitted he trained MQ in dog agility training and that he had traveled to Europe with MQ and CQ to allow MQ to compete in a dog agility competition in Luxembourg.

c.  LE CLAIR said he had hit his head while in Luxembourg, exacerbating a previous condition he called "brain shearing."  He said the effect of this was it made him dizzy and "loopy" and caused him to have bad judgement during these spells.[2]

d.  LE CLAIR admitted he went to a bar in Paris, France where the two boys got drunk, though he said CQ had purchased the drinks consumed by MQ and CQ.  LE CLAIR brought them back to the hotel they were staying at near the Arc de Triomphe.  LE CLAIR recalled MQ vomiting all over the hotel room and that LE CLAIR had to clean up some of the vomit.

e.  LE CLAIR said that the act of cleaning vomit off of the carpet caused him to crouch down to ground level and then stand up several times and that this motion exacerbated his mental condition and caused him to be loopy.

f.  LE CLAIR recalled that MQ passed out and CQ took off all of MQ's clothes and laid MQ in LE CLAIR's bed before he also passed out.  CQ warned LE CLAIR to watch MQ and make sure he did not choke on any vomit while he was asleep.  LE CLAIR was very worried about MQ.

---

[2]     I received LE CLAIR's Kaiser medical records, which confirmed he went to Kaiser Roseville hospital shortly after returning from Europe in 2017.  While I am not a medical expert, these records indicate his CT head scan was "unremarkable." He was discharged after several hours with instructions to ice the sore area as directed, return if he experienced serious conditions, and follow up with primary care physician in 2-3 weeks, or sooner if not improved.

g. LE CLAIR admitted he took a few pictures with an Android tablet of MQ while he was asleep and naked. LE CLAIR claimed he only took two or three photos and that MQ's genitals were visible, but may have been blurry in those photos.

h. LE CLAIR did not have an explanation as to why he had taken these photos.

i. LE CLAIR also said he did not touch MQ, except to clean vomit off of his body with a washcloth.

j. LE CLAIR recalled when LQ and CQ confronted him about taking the photos after they had returned from Europe. LE CLAIR said he had admitted to taking the photos and had apologized to LQ and promised her he would delete the photos. LE CLAIR admitted he had transported the photos back to the United States on his tablet, and had attempted to delete them after the conversation with LQ and CQ. However, LE CLAIR was unsure if the photos had possibly been backed up to either his Microsoft OneDrive cloud storage, or the SUBJECT ACCOUNT (LE CLAIR said he logged in to both his Google account and his Microsoft account using the same email, the SUBJECT ACCOUNT).

k. LE CLAIR said he used both his Google Drive cloud storage and his Microsoft OneDrive account (the SUBJECT ACCOUNT) to back up his files. LE CLAIR said his intent was to fully delete the files, but he was unsure if he had been successful.

16.     During a break in the interview, investigators located two hidden camera devices in LE CLAIR's bedroom, as well as digital video footage that appeared to have been captured by these devices. This footage depicted various boys and men showering, changing clothes, and otherwise naked, mostly in the master bathroom of LE CLAIR's residence. Most of the video files began depicting LE CLAIR placing the camera device in place and ended with LE CLAIR retrieving the device after the subject of the video had finished changing or showering. At least four of these videos

depicted MQ, and at least one depicted CQ, both before they were 18 years of age.  LE CLAIR made the following statement about these videos, in part:

    a.   LE CLAIR admitted he had been planting hidden camera devices and capturing young boys and men naked for over a decade.  He stated he would save these files to one of his computer devices and generally would insert the name or initials of the subject of the video into the filename to keep track of who was in the video.

        i.   Note: The files located that depicted MQ had "[MQ's first name] Q" in the filename, and the video that depicted CQ had "[CQ's first name] Q" in the filename.  Other files that depicted hidden video of naked boys similarly contained first names or initials in the filenames.

    b.   When asked why LE CLAIR had captured these videos, he replied they were "prurient."  He later said that some things have no reason behind them.  He also stated he was a pornography collector and these were for his pornography collection.  He denied having sent them to anyone else or posting them to the internet.

17.    While LE CLAIR did not know specifically which files would be found in his Google Drive cloud storage account, he said he regularly used the SUBJECT ACCOUNT to back up files and store files.  He did not seem to pay close attention to which files were copied to his online storage accounts, including the SUBJECT ACCOUNT.  I suggest there is probable cause to believe that copies of the explicit photos LE CLAIR took of MQ while in Paris, France, as well as copies of the surreptitious explicit videos LE CLAIR captured with his hidden camera devices may be found in the SUBJECT ACCOUNT, either as individual files or as part of an online backup of his Android tablet device.

18.    LE CLAIR was arrested based on probable cause to believe he had committed a violation of 18 U.S.C. § 2251(c), and a grand jury subsequently returned an indictment, charging LE CLAIR with

that violation in case 2:22-CR-0197-JAM.  Investigation continues into other crimes LE CLAIR may

have committed, including sexual exploitation of children in his residence, in violation of 18 U.S.C. §

2251(a) and / or (e).

19.     The writer served a preservation request on GOOGLE on September 23, 2022 requesting

the contents of the SUBJECT ACCOUNT be preserved pending this search warrant and received

confirmation from GOOGLE that the account would be preserved for a period of 90 days.

## V.     CHARACTERISTICS COMMON TO INDIVIDUALS WHO HAVE A SEXUAL INTEREST IN CHILDREN OR WHO PRODUCE, RECEIVE AND/OR POSSESS CHILD PORNOGRAPHY, OR TRAVEL INTERNATIONALLY TO ENGAGE IN ILLICIT SEXUAL CONDUCT WITH MINORS

37.     Based on my previous investigative experience related to child exploitation

investigations, and the training and experience of other law enforcement officers with whom I have had

discussions, I know there are certain characteristics common to individuals who have a sexual interest in

children and/or produce, receive, or possess images of child pornography and/or travel internationally to

engage in illicit sexual conduct with minors:

a)     Individuals who have a sexual interest in children and/or produce, receive, or

possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with

minors may receive sexual gratification, stimulation, and satisfaction from contact with children, or from

fantasies they may have viewing children engaged in sexual activity or in sexually suggestive poses,

such as in person, in photographs, or other visual media, or from literature describing such activity.

b)     Individuals who have a sexual interest in children and/or produce, receive, or

possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with

minors may collect sexually explicit or suggestive materials, in a variety of media, including

photographs, magazines, motion pictures, videotapes, books, slides and/or drawings or other visual

media.  Individuals who have a sexual interest in children or images of children oftentimes use these

materials for their own sexual arousal and gratification.  Further, they may use these materials to lower

the inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to

demonstrate the desired sexual acts.

c)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors almost always possess and maintain their hard copies of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location. Individuals who have a sexual interest in children or images of children typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica, and videotapes for many years.

d)      Likewise, individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors often maintain their child pornography images in a digital or electronic format in a safe, secure and private environment, such as an electronic account, on a computer and surrounding area.  These child pornography images are often maintained for several years and are kept close by, usually at the possessor's residence, inside the possessor's vehicle, or, at times, on their person, to enable the individual to view the child pornography images, which are valued highly.

e)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors also may correspond with and/or meet others to share information and materials, rarely destroy correspondence from other child pornography distributors/possessors, conceal such correspondence as they do their sexually explicit material, and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact and who share the same interests in child pornography.

f)      Individuals who have a sexual interest in children and/or produce, receive, or possess images of child pornography and/or travel internationally to engage in illicit sexual conduct with minors often utilize multiple accounts to converse with potential victims.  This is often a tool to either keep track of victims, represent oneself as more than one person, or a safety net in case one of the accounts is shut down by the service provider.  Illicit accounts are often established with little or no subscriber information, and when subscriber information is provided, it is often incomplete and/or

fictitious.

## VI.     CONCLUSION

38.     Based on the foregoing, there is probable cause to believe that the federal criminal statute(s) cited herein have been violated, and that the contraband, property, evidence, fruits and instrumentalities of these offenses, more fully described in Attachment B of this affidavit, are located in the SUBJECT ACCOUNT, described in Attachment A.  I respectfully request that this Court issue a search warrant for the SUBJECT ACCOUNT, authorizing the seizure and search of the items described in Attachment B.

39.     Because the warrant will be served on GOOGLE, LLC, who will then compile the requested records at a time convenient to it, I further request execution of the requested warrant be permitted at any time in the day or night.

40.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

Respectfully submitted,


/s/
Scott A. H. Schofield
Special Agent
Federal Bureau of Investigation

Subscribed to me over the telephone
and signed by me pursuant to Fed. R.
Crim. P. 4.1 / 41(d)(3):                     October 28, 2022

The Honorable Carolyn K. Delaney
UNITED STATES MAGISTRATE JUDGE


/s/ Christina McCall
Approved as to form by AUSA CHRISTINA McCALL

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the GOOGLE account:

- TLECLAIR101@GMAIL.COM

  that is stored at premises controlled by GOOGLE, LLC, a company that accepts legal

  process via a law enforcement portal I have used and am familiar with.

**ATTACHMENT B**

**Particular Things to be Seized**

**I.        Information to be disclosed by** GOOGLE, LLC **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, posts, messages, logs, chats, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.        The **entire contents** of the GOOGLE accounts (including gmail account) and any information or data associated with the accounts, including but not limited to:

b.        All backups of Android or other devices contained in the GOOGLE account;

c.        Gmail account contents, including stored or preserved copies of posts, photos, videos, messages, chats, and emails sent to and from the accounts, draft messages and emails, the source and destination accounts associated with each message and email, the date and time at which each message or email was sent, contacts, and all contents of these messages and emails

d.        Google search and Chrome/ internet browsing history;

e.        Chrome bookmarks;

f.        Google Play transaction history;

g.        Google services used by account;

h.        Recovery email and SMS recovery number;

i.        Google account ID;

j.      Last logins to the account, including IP address, date and time;

k.      Accounts associated by cookie (including machine cookies), SMS number, recovery email or IP address;

l.      Address book contents;

m.      Location history and data;

n.      YouTube browsing and search history;

o.      Stored passwords to websites in Chrome browser and in other Google products;

p.      Contents of the Google Drive;

q.      Contents of the Google Docs and Sheets;

r.      Contents of the Google Calendar;

s.      Contents of the Google Photos;

t.      Google Voice data (including stored messages); and

u.      Google One data and contents.

v.      All records or other information regarding the user(s) of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, email and alternative email addresses provided during registration, methods of connecting, log files, and any means and source of payment (including any credit or bank account number(s) in full) if provided;

w.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

AFFIDAVIT                                                                 3

**The Provider is hereby ordered to disclose the information to the government within 14 days of the issuance of this warrant.**

II.     **Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 18 U.S.C. §§ 2251, Sexual Exploitation of Children; and Title 18 U.S.C. §2423(c), Engaging in Illicit Sexual Conduct in a foreign place, including, for each account or identifier listed on Attachment A, for the time period of January 1, 2017 to the present, information pertaining to the following:

(a)   Sexually explicit communication with, and receipt or distribution of sexually explicit images/videos from, minors;

(b)   Possession of sexually explicit images/videos of minors;

(c)   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the GOOGLE account owner(s);

(d)   Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(e)   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(f)   Information indicating a link between the account(s) and any other online accounts, i.e. Snapchat, Microsoft, Expedia, or other account(s);

(g)   The identity of the person(s) who communicated with the user(s) of any of the

accounts about matters relating to the production and/or receipt and/or distribution and/or possession of child pornography, and/or engaging in sexually illicit conduct in a foreign place, including records that help reveal their whereabouts;

(h) Any location or other data indicative of travel between California and Paris, France;

(i) Any communications (email or otherwise) regarding the 2017 trip to Europe.

(j) Any records regarding the purchase of, or use of, any hidden camera devices, such as a camera hidden in a pen or a car key fob;

(k) Any and all communications with MQ, CQ, LQ, or any other identified persons appearing in hidden camera footage recovered in the investigation, regardless of the type of communication (i.e. email or chat message or audio call, etc.).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to federal and local law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>INFORMATION ASSOCIATED WITH<br>TLECLAIR101@GMAIL.COM THAT IS STORED AT<br>PREMISES CONTROLLED BY GOOGLE, LLC | )<br>)<br>)   Case No.   2:22-sw-0782 CKD<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the   Northern   District of   California
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before   November 11, 2022   *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to: <u>any authorized U.S. Magistrate Judge in the Eastern District of California.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:   October 28, 2022 at 11:30 am

_Judge's signature_

City and state:   Sacramento, California     Carolyn K. Delaney, U.S. Magistrate Judge
_Printed name and title_

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** |||
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : |||
| Inventory of the property taken and name of any person(s) seized: |||

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to telephonically, and returned before me this date.

_____                    _____
Signature of Judge                                                                    Date

## <u>ATTACHMENT A</u>

### Property to Be Searched

This warrant applies to information associated with the GOOGLE account:

- TLECLAIR101@GMAIL.COM

  that is stored at premises controlled by GOOGLE, LLC, a company that accepts legal

  process via a law enforcement portal I have used and am familiar with.

## ATTACHMENT B

### Particular Things to be Seized

**I.**      **Information to be disclosed by** GOOGLE, LLC **(the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any emails, records, files, posts, messages, logs, chats, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to requests made under 18 U.S.C. § 2703(f), the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

     a.      The **entire contents** of the GOOGLE accounts (including gmail account) and any information or data associated with the accounts, including but not limited to:

     b.      All backups of Android or other devices contained in the GOOGLE account;

     c.      Gmail account contents, including stored or preserved copies of posts, photos, videos, messages, chats, and emails sent to and from the accounts, draft messages and emails, the source and destination accounts associated with each message and email, the date and time at which each message or email was sent, contacts, and all contents of these messages and emails

     d.      Google search and Chrome/ internet browsing history;

     e.      Chrome bookmarks;

     f.      Google Play transaction history;

     g.      Google services used by account;

     h.      Recovery email and SMS recovery number;

     i.      Google account ID;

AFFIDAVIT

j.      Last logins to the account, including IP address, date and time;

k.      Accounts associated by cookie (including machine cookies), SMS number, recovery email or IP address;

l.      Address book contents;

m.      Location history and data;

n.      YouTube browsing and search history;

o.      Stored passwords to websites in Chrome browser and in other Google products;

p.      Contents of the Google Drive;

q.      Contents of the Google Docs and Sheets;

r.      Contents of the Google Calendar;

s.      Contents of the Google Photos;

t.      Google Voice data (including stored messages); and

u.      Google One data and contents.

v.      All records or other information regarding the user(s) of the accounts, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, email and alternative email addresses provided during registration, methods of connecting, log files, and any means and source of payment (including any credit or bank account number(s) in full) if provided;

w.      All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

AFFIDAVIT                                                      ;

**\*\*The Provider is hereby ordered to disclose the information to the government within 14 days of the issuance of this warrant.\*\***

II.     **Information to be seized by the government**

All information described above in Section I that constitutes evidence, instrumentalities, contraband, or fruits of violations of 18 U.S.C. §§ 2251, Sexual Exploitation of Children; and Title 18 U.S.C. §2423(c), Engaging in Illicit Sexual Conduct in a foreign place, including, for each account or identifier listed on Attachment A, for the time period of January 1, 2017 to the present, information pertaining to the following:

(a)   Sexually explicit communication with, and receipt or distribution of sexually explicit images/videos from, minors;

(b)   Possession of sexually explicit images/videos of minors;

(c)   Evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the GOOGLE account owner(s);

(d)   Evidence indicating the account owner's state of mind as it relates to the crimes under investigation;

(e)   The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s);

(f)   Information indicating a link between the account(s) and any other online accounts, i.e. Snapchat, Microsoft, Expedia, or other account(s);

(g)   The identity of the person(s) who communicated with the user(s) of any of the

AFFIDAVIT

accounts about matters relating to the production and/or receipt and/or distribution and/or possession of child pornography, and/or engaging in sexually illicit conduct in a foreign place, including records that help reveal their whereabouts;

(h) Any location or other data indicative of travel between California and Paris, France;

(i) Any communications (email or otherwise) regarding the 2017 trip to Europe.

(j) Any records regarding the purchase of, or use of, any hidden camera devices, such as a camera hidden in a pen or a car key fob;

(k) Any and all communications with MQ, CQ, LQ, or any other identified persons appearing in hidden camera footage recovered in the investigation, regardless of the type of communication (i.e. email or chat message or audio call, etc.).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to federal and local law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

AFFIDAVIT